IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

STERLING CURRENCY GROUP LLC,

    Plaintiff,

vs.

JAMES MAURER and
MONETIZERS LLC
(d/b/a Iraqidinar.org),

    Defendants.

Case No. _____

HONORABLE _____

Mark D. van der Laan (P55921)
Mark J. Magyar (P75090)
DYKEMA GOSSETT PLLC
Attorneys for Plaintiff
300 Ottawa Avenue, N.W., Suite 700
Grand Rapids, MI 49503-2306
(616) 776-7539

and

David M. Lilenfeld
Georgia Bar No. 452399
Morgan Wood Bembry
Georgia Bar No. 146077
LILENFELD PC
Co-Counsel for Plaintiff
2970 Peachtree Road, N.W., Suite 530
Atlanta, GA 30305

## **COMPLAINT**

Sterling Currency Group LLC ("Sterling") files this Complaint against James Maurer and Monetizers LLC (d/b/a Iraqidinar.org) (collectively, "Defendants") and states as follows:

### I. Introduction

1. As a business that operates primarily on the Internet, Sterling depends heavily on its online reputation, including its organic Google ranking. It invests significant resources into maintaining high rankings on Google and other online search engines. In fact, through extensive efforts and expense, in 2010 and 2011, Sterling's Websites (<SterlingCurrencyGroup.com> and <DinarBanker.com>) ranked extremely high on Google for search terms critical to Sterling's business (e.g., "Iraqi Dinar," "Dinar" and "Buy Dinar.").

2. Its efforts are being sabotaged, though, by Defendants' malicious acts of posting "bad links" (a.k.a. "Google Bowling"[1]) to Sterling's websites and thereby harming their rankings.

3. This is a suit for (1) trademark infringement, (2) trademark dilution, (3) tortious interference with business relations, (4) unfair competition, (5) fraud, (6) injunctive relief, (7) attorneys' fees and (8) pre- and post-judgment interest.

### II. Parties

4. Plaintiff Sterling is organized and existing under the laws of the State of Georgia with its principal place of business at 3277 Roswell Road, Suite 670, Atlanta, GA 30305.

5. Sterling's federally registered trademarks are STERLING CURRENCY GROUP, DINAR BANKER.COM and DINAR BANKER (word mark).

6. Sterling's state (Georgia) registered trademarks are: (1) DINARBANKER.COM, (2) DINAR BANKER (word mark) and (3) DINAR BANKER (logo).

7. Sterling's unregistered trademark is STERLINGCURRENCYGROUP.COM. Sterling uses the above domain names for its e-commerce websites ("Sterling's Websites").

---

[1] See Exhibit A for background information about "Google Bowling" dating back to 2005.

8. Defendant James Maurer is an individual residing at 1413 Ruddiman Drive, North Muskegon, Michigan, 49445. Mr. Maurer can be served at his residential address. He is the sole member of Monetizers LLC and operator of the website at <IraqiDinar.org>.

9. Defendant Monetizers LLC is a limited liability company organized under the law of the State of Michigan. Monetizers does business as IraqiDinar or <Iraqidinar.org> and operates a commercial website at that domain name. Monetizers can be served with process through its Registered Agent, James Maurer. The Registered Agent's Office address listed with the Michigan Secretary of State is 1413 Ruddiman Drive, North Muskegon, Michigan 49445.

### III. Subject Matter Jurisdiction

10. This action arises under the Lanham Trademark Act (15 U.S.C. §§ 1051-1127). Therefore, the Court has federal question jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1338(a).

11. The Court also has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332 because Defendants and Sterling are residents of different states and the amount in controversy in this case far exceeds the sum or value of $75,000.00.

12. The Court has supplemental jurisdiction over Sterling's state law claims for tortious interference with business relations, unfair competition and fraud based on 28 U.S.C. § 1367(a).

13. The facts supporting this Court's exercise of subject matter jurisdiction are detailed below.

### IV. Personal Jurisdiction

14. This Court has personal jurisdiction over Defendants.

3

15. Defendants have committed unlawful and intentional tortious acts with the full knowledge that their acts would cause injury to Sterling including injury to Sterling within the State of Georgia.

16. By taking the affirmative action of having bad links to Sterling's Websites placed on other sites on the Internet, Defendants engaged in intentional acts. Sterling's Websites plainly identify Sterling and its location, so Defendants knew or should have known that the Websites and trademarks belonged to a Georgia entity and that a Georgia entity would be harmed by their actions.

## V. Venue

17. Venue is proper in this judicial district under 28 U.S.C. §§ 1391(a)(2) and 1391(b)(2) because a substantial part of the events giving rise to the claim occurred in this judicial district.

## VI. Factual Allegations Applicable to All Counts

*a. Sterling's Business, Trademarks and Websites*

18. Sterling is a Money Services Business registered with the United States Department of the Treasury.

19. Sterling has been using the marks STERLING CURRENCY GROUP and STERLINGCURRENCYGROUP.COM as trademarks in interstate commerce since as early as October 2004.

20. The marks STERLING CURRENCY GROUP and STERLINGCURRENCYGROUP.COM are inherently distinctive. To the extent that they are not inherently distinctive, they have acquired secondary meaning.

21. The Mark STERLING CURRENCY GROUP is registered with the United States Patent and Trademark Office, U.S. Reg. No. 4,204,882.

DYKEMA GOSSETT•A PROFESSIONAL LIMITED LIABILITY COMPANY•300 OTTAWA AVENUE N.W., SUITE 700•GRAND RAPIDS, MICHIGAN 49503

22. Sterling has been using the marks DINAR BANKER and DINARBANKER.COM as trademarks in interstate commerce since July 2007.

23. The marks DINAR BANKER and DINARBANKER.COM are inherently distinctive. To the extent that they are not inherently distinctive, they have acquired secondary meaning.

24. The Mark DINAR BANKER is registered with the United States Patent and Trademark Office, U.S. Reg. No. 4,184,480, and the Mark DINARBANKER.COM is registered with the United States Patent and Trademark Office, U.S. Reg. No. 4,184,481.

25. The Mark DINAR BANKER is also registered with the State of Georgia, Reg. No. S-25615, and the Mark DINARBANKER.COM is registered with the State of Georgia, Reg. No. S-25616.

26. Sterling buys and sells foreign currencies, primarily the Iraqi Dinar, to the general public through its Websites.

27. Sterling relies heavily on its organic search rankings[2] with Google to promote its business. Sterling spends considerable resources to increase and maintain its organic rankings with Google for both <SterlingCurrencyGroup.com> and <DinarBanker.com>.

*b.     Bad Links*

28. For many years, Google considered a website to be "important" if links to that website appeared on many other websites. The more links that appeared, the more "important" the linked site was considered to be by Google. Therefore, Google organically ranked websites with many links higher than similar websites with few links.

---

[2] "Organic search results are listings on search engine results pages that appear because of their relevance to the search terms, as opposed to their being advertisements." (http://en.wikipedia.org/wiki/Organic_search).

5

29. This factor in the rankings became known to the Search Engine Optimization (SEO) industry. Consequently, the industry developed ways to artificially post many links to websites they were promoting. In other words, instead of a website receiving a large number of links to it based on the quality of its content as judged by unrelated parties, the website received a large number of links based on links placed by the website's owners themselves. One way to create artificial linking was to create many websites with the sole purpose of using those sites to post links to other websites. Thus, a variety of linking networks developed on the Internet to serve this purpose.

30. Search engines, especially Google, became wise to the SEO industry's practice of creating artificial links. As a result of this practice, the number of links to a particular website was no longer an accurate measure of the site's importance. Thus, Google stopped using the statistic as a factor in its rankings.

31. In fact, Google began to punish sites that it believed had engaged in the practice of artificial linking, also known as "bad links." The punishment doled out by Google is significantly lowering the site's "ranking," which means that the link to the website appears much farther down on Google's search results page. In turn, fewer Google users see the listing for that website. This policy was fortified in a new version of Google's algorithm, a version dubbed "Penguin," in late 2011 or early 2012.

32. The fact that Google was punishing websites it thought had engaged in bad links became known to the SEO industry and the general public. Unfortunately, people with bad intentions learned they could take advantage of Google's new policy by running campaigns placing artificial links on their competitors' websites – resulting in their competitors being punished with lower rankings on Google. This practice has become known as "Google

6

Bowling." (See Exhibit A for background information about "Google Bowling" dating back to 2005.)

### c. Defendants' Placement of Bad Links

33. Defendants run a variety of informational websites on several subjects, including the Iraqi Dinar at <IraqiDinar.org>. Defendants earn money by charging for ad space on their websites, including <IraqiDinar.org>. The more people visit their websites, the more ad revenue their sites generate, and the more money they make. Depending on their contractual terms with their advertisers, Defendants may also make money when a visitor to one of their sites clicks on an ad.

34. In or about April 2012, Defendants engaged in a bad link campaign against Sterling's <SterlingCurrencyGroup.com> and <DinarBanker.com>. They did this by using Link-Vault.com (a non-party linking network) to post many artificial links (a/k/a bad links) to Sterling's sites on the Internet. Defendants undertook these campaigns with the knowledge that such a bad link campaign would cause Google to punish Sterling's website, as described in Paragraphs 35-36, above.

35. In the course of their bad link campaign, Defendants caused at least 500 bad links to be posted against Sterling's Websites. The links currently known to Sterling were posted by Defendants using Link-Vault.com (non-party) but Defendants may have used other means for posting bad links.

36. Defendants would benefit from lowering the high rankings of Sterling's Websites because more Google users would see (and therefore visit) Defendants' own website <IraqiDinar.org> and perhaps other Iraqi Dinar related websites either or both Defendants may own or operate.

7

37. Defendants may also have initiated the bad link campaigns against Sterling's Websites because of ill will toward Sterling, one of Sterling's past consultants (Stefano Grossi) or toward the purchase of Iraqi Dinar in general (see, for example, Exhibit B, a page from Defendants' site <JamesMaurer.com>)).

38. For example, one such link has been placed on the web page available at <Everything-Animals.com/K9-ADVANTIX.html>. (See Exhibit C.)

39. Unfortunately for Sterling, Defendants' comprehensive bad link campaign was very effective. Prior to Defendants' conduct, the links to Sterling's Websites regularly appeared on the first page of Google, and, more specifically, among the top four results. This made Sterling's links highly visible to searchers interested in buying or selling foreign currencies, including the Iraqi Dinar. These high rankings contributed significantly to Sterling's sales revenue. Correspondingly, after Defendants' bad link campaign caused Google to punish Sterling, Sterling's revenue suffered significantly.

40. After Defendants' bad link campaign took hold, the links to Sterling's sites plummeted. Instead of its links appearing high on Google's first page, they appeared, at varying times, on Google's 2nd, 3rd, 4th and even 6th page. This resulted in a rapid decline in the visibility of Sterling's links and a corollary significant drop in the number of visitors to Sterling's sites and number of sales.

41. Defendants strategically placed these bad links to Sterling's domain names <SterlingCurrencyGroup.com> and <DinarBanker.com> to cause such a decline in the visibility of Sterling's links in search results and, in turn, to increase the visibility of their own website <IraqiDinar.org> and the site's profitability. Other motivations, not yet known to Sterling, could have driven Defendants to engage in this harmful conduct.

42. Defendants' wrongful acts have injured Sterling in excess of five million dollars ($5,000,000.00).

43. Sterling was apparently not the only of victim of Defendants' Google Bowling. In or around June 2012, Defendants initiated a bad links campaign against <Bed-Bugs.org>, a site in competition with Defendants' <BadBedBugs.com> for visitor traffic.

44. By initiating a bad links campaign against this competitive site <Bed-Bugs.org>, Defendants could harm the competitor's search rankings and consequently increase traffic to, and ad revenues from, their site <BadBedBugs.com>.

45. Defendants' parallel activity against <Bed-Bugs.org> suggests that these devious bad linking activities are a regular part of Defendants' business practices.

## VII. Counts

### Count One
### Trademark Infringement and False Designation of Origin
### Under the Lanham Act (15 U.S.C. § 1051 *et seq*. and § 1125)

46. The allegations set forth in Paragraphs 1 through 45 and 58 through 97 are incorporated herein.

47. Because Sterling advertises, markets and sells its services under the Marks STERLING CURRENCY GROUP, STERLINGCURRENCYGROUP.COM, DINAR BANKER and DINARBANKER.COM ("Sterling's Marks"), Sterling's Marks are the means by which its services are distinguished from those of others in the same or related fields.

48. Because of Sterling's long, continuous and exclusive use of its Marks, the Marks have come to mean, and are understood by customers and the public to signify, services of Sterling.

49. Defendants' wrongful conduct includes the use of Marks in commerce in connection with its goods or services without Sterling's consent.

9

50. Defendants' use of the Marks in commerce infringes upon Sterling's federally registered Marks STERLING CURRENCY GROUP, DINAR BANKER and DINARBANKER.COM in violation of the Lanham Act, including but not limited to 15 U.S.C. § 1114(1) and § 1125(a).

51. This wrongful conduct of Defendants has and is likely to continue to cause confusion, cause mistake, or deceive as to the source, origin, or authenticity of Defendants' products or services.

52. This wrongful conduct of Defendants has and is likely to continue to cause confusion, cause mistake, or deceive as to the affiliation, connection, or association of Defendants with Sterling.

53. This wrongful conduct of Defendants has and is likely to continue to cause confusion, cause mistake, or deceive as to the origin, sponsorship, or approval of Defendants' goods, services, or commercial activities by Sterling.

54. This wrongful conduct of Defendants also, in commercial advertising or promotion, misrepresents the nature, characteristics or qualities of Defendants' goods, services, or commercial activities and of Sterling's services and commercial activities.

55. Sterling believes that it is likely to be damaged, and has already been damaged, by Defendants' wrongful conduct.

56. Therefore, Defendants are liable to Sterling under 15 U.S.C. § 1114(1) and § 1125(a). Sterling is entitled to recover damages, which include any and all profits Defendants have made as a result of their wrongful conduct and any damages sustained by Sterling. 15 U.S.C. § 1117(a).

57. In addition, because of Defendants' infringement of Sterling's Marks as described above, the award of actual damages and profits should be trebled pursuant to 15 U.S.C. §1117(b). Alternatively, Sterling is entitled to statutory damages under 15 U.S.C. § 1117(c).

### Count Two
### Dilution of Famous Mark
### Under the Lanham Act (15 U.S.C. § 1051 et seq.)

58. The allegations set forth in Paragraphs 1 through 57 and 64 through 97 are incorporated herein.

59. Sterling's Marks are famous trademarks within the meaning of the Anti-Dilution Act (15 U.S.C. § 1125(c)), as the Marks are inherently distinctive, have acquired significant distinctiveness, have a great degree of recognition among those who buy and sell foreign currencies online, are used in connection with websites that have made millions of sales nationwide and have not been encroached upon by third parties.

60. Defendants' adoption and commercial use of the Marks, including approximations and simulations thereof, constitutes use in commerce of marks that have become famous.

61. Defendants' use of the Marks in connection with their bad link campaigns causes dilution through tarnishment of the reputation of Sterling and its Marks.

62. Sterling has been and continues to be damaged by this dilution, and Sterling has no adequate remedy at law.

63. Based on Defendants' knowledge of Sterling and of its trademarks, Defendants' acts of dilution are willful.

### Count Three
### Tortious Interference with Business or Contractual Relations
### (as to Sterling's Relationship with Google)

64. The allegations set forth in Paragraphs 1 through 63 and 70 through 97 are incorporated herein by reference.

65. Defendants acted improperly and without privilege in having links to Sterling's Websites placed on other, derogatory Internet websites.

66. Defendants' actions were done purposely and with malice with the intent to injure Sterling and/or its business and/or its relationship with Google.

67. By tricking Google into believing that Sterling posted artificial links and was therefore an unethical business, Defendants' induced Google to alter, to Sterling's detriment, the terms of its business relationship with Sterling (namely, to punish Sterling when, before Defendants' bad link campaigns, Sterling was in good standing with Google).

68. Defendants' actions have caused Sterling financial injury.

69. Therefore, Defendants are liable to Sterling for tortious interference with business or contractual relations for interfering with its relationship with Google.

Count Four
Tortious Interference with Business or Contractual Relations
(as to Sterling's Relationship with Its Customers)

70. The allegations set forth in Paragraphs 1 through 69 and 76 through 97 are incorporated herein by reference.

71. Defendants acted improperly and without privilege in having links to Sterling's Websites placed on other, derogatory Internet websites.

72. Defendants' actions were done purposely and with malice with the intent to injure Sterling and its business relations and expectancy.

73. Defendants' actions induced third-parties (namely, past, current and potential customers searching for a reliable source from which to acquire the foreign currencies Sterling sells and prior customers trying to find Sterling's sites so that they can make additional purchases) not to enter into or continue a business relationship with Sterling. Furthermore, Sterling was harmed because customers did not find Sterling's sites in search results.

74. Defendants' actions have caused Sterling financial injury.

75. Therefore, Defendants are liable to Sterling for tortious interference with business and contractual relations and expectancy for interfering with its relationship with potential and prior customers.

## Count Five
### Unfair Competition Under the Lanham Act (15 U.S.C. § 1125(a))

76. The allegations set forth in Paragraphs 1 through 75 and 82 through 97 are incorporated herein by reference.

77. Defendants' uses of Sterling's Marks are meant to fabricate an affiliation in the eyes of the public and of search engine providers between Defendants and Sterling.

78. Defendants engage in the activities listed in the preceding paragraph for the sole purposes of misleading the public and search engine providers and unfairly competing with Sterling.

79. Defendants' activities collectively constitute unfair competition, which is prohibited by 15 U.S.C. § 1125(a).

80. These activities have created actual confusion among the public and search engine providers and will likely continue to cause confusion, mistake or deception among the public and search engine providers.

81. Defendants' activities have caused and will continue to cause irreparable damage to Sterling for which there is no adequate remedy at law.

## Count Six
### Unfair Competition

82. The allegations set forth in Paragraphs 1 through 81 and 86 through 97 are incorporated herein by reference.

13

83. The acts and conduct of Defendants constitute unfair competition pursuant to the common law of the State of Michigan.

84. Defendants' acts and conduct as alleged above have damaged and will continue to damage Sterling and have resulted in an illicit gain of profit to Defendants in an amount that is unknown at the present time.

85. Therefore, Defendants are liable to Sterling for unfair competition under Michigan law.

### Count Seven
### Fraud and Misrepresentation

86. The allegations set forth in Paragraphs 1 through 85 and 94 through 97 are incorporated herein by reference.

87. Defendants misrepresented to Link-Vault.com during 2012 that the domain names <SterlingCurrencyGroup.com> and <DinarBanker.com> belonged to them and Defendants' made the misrepresentations to Link-Vault.com that they were acting with authority from Sterling to post links to sterlingcurrency.com.

88. Defendants' representations were false and made without Sterling's authorization.

89. Defendants knew the representations were false when made and knew they were acting without authority from Sterling.

90. Defendants made their misrepresentations with the intent that Link-Vault.com would post the links to Sterling's domain names.

91. Link-Vault.com relied upon Defendants' misrepresentations in permitting the links pointing to Sterling's domain names to be placed.

92. Sterling has been damaged by Defendants' fraudulent misrepresentations.

93. Therefore, Defendants are liable to Sterling for fraud and misrepresentation.

<u>Count Eight</u>
<u>Injunctive Relief Under Lanham Act and Michigan Law</u>

94. The allegations set forth in Paragraphs 1 through 93 are incorporated herein by reference.

95. Sterling would experience additional harm by further conduct by either or both Defendants, as described in this Complaint.

96. Sterling has no adequate remedy at law for Defendants' wrongful conduct because, among other things, (a) Sterling's Marks are unique and valuable property which have no readily determinable market value, (b) Defendants' infringement constitutes harm to Sterling such that Sterling could not be made whole by any monetary award and (c) if Defendants' wrongful conduct is allowed to continue, the public is likely to become further confused, mistaken, or deceived as to the source, origin or authenticity of the infringing uses of Sterling's Marks.

97. Therefore, Sterling is entitled to injunctive relief both federal and Michigan law, including 15 U.S.C. § 1116(a).

## VIII. <u>Prayer for Relief</u>

98. In relation to their wrongful acts described above and to each and every count set forth above, Defendants have acted in bad faith and have caused Sterling damages, unnecessary trouble and expense. Defendants intentionally and in bad faith engaged in infringement with full knowledge of the harm that would result to the public and to Sterling.

99. Sterling, therefore, is entitled to recover all expenses and fees arising from the misconduct of Defendants giving rise to the present litigation, including the reasonable attorney fees expended by Sterling, under applicable Michigan and federal law, including attorney fees under the Lanham Act.

100. Sterling respectfully requests the following relief from the Court:

 (1) a finding that Defendants are liable to Sterling as follows:

  a. on Count One for infringement of Sterling's Marks in violation of the Lanham Act;

  b. on Count Two for dilution by tarnishment of Sterling's Marks in violation of the Lanham Act;

  c. on Count Three for tortious interference of Sterling's business relationship with Google;

  d. on Count Four for tortious interference of Sterling's business relationships with potential and prior customers;

  e. on Count Five for unfair competition in violation of the Lanham Act;

  f. on Count Six for unfair competition in violation of Michigan law;

  g. on Count Seven for fraud and misrepresentation in violation of Michigan law; and

  h. on Count Eight for injunctive relief under the Lanham Act and Michigan law.

 (2) an award of money damages in an amount sufficient to compensate Sterling for the injuries it sustained as a result of Defendants' actions, but no less than five million dollars ($5,000,000.00);

 (3) trebled damages, as permitted by law;

16

(4) injunctive relief to prevent further, similar conduct by either or both Defendants;

(5) an award of Sterling's costs, including attorney fees; and

(6) such other and further relief the Court deems just and proper.

### Jury Demand

Sterling demands a trial by jury on all issues so triable.

Dated: August 14, 2013

DYKEMA GOSSETT PLLC
Attorneys for Plaintiff

By: */s/ Mark D. van der Laan*
    Mark D. van der Laan (P55921)
    300 Ottawa Avenue, N.W., Suite 700
    Grand Rapids, MI 49503-2306
    (616) 776-7539
    mvanderlaan@dykema.com

David M. Lilenfeld
Morgan Wood Bembry
LILENFELD PC
Co-Counsel for Plaintiff
2970 Peachtree Road, N.W., Suite 530
Atlanta, Georgia 30305
(404) 201-2520 - telephone
(404) 393-9710 - facsimile
David@LilenfeldPC.com
Morgan@LilenfeldPC.com

GR01\193916.2
ID\MDV - 110071\0001